UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PETE B. COPELAND, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:06-CV-00632-MLM |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## BRIEF IN SUPPORT OF THE COMPLAINT

### NATURE OF ACTION AND PRIOR PROCEEDINGS

This is a proceeding under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, 1381 et. seq. Sections 405(g) and 1383(c) of the Social Security Act provide for judicial review of a "final decision" of the Commissioner of the Social Security Administration.

Plaintiff filed an application for a Period of Disability, Disability Insurance Benefits, and Supplemental Security Income under Titles II and XVI of the Social Security Act on October 17, 2003, alleging an onset date of disability of October 8, 2003. (Tr. at 139-141, 356-358.) The claim was denied, and Plaintiff requested a hearing. (Tr. at 118.)

On September 23, 2005, following a hearing, the Administrative Law Judge ("ALJ") found that although Plaintiff could not return to his past relevant work, he retained the residual functional capacity to perform light work and thus was not disabled. (Tr. at 19-23.) Plaintiff requested review by the Appeals Council of the Social Security Administration. (Tr. at 12.) On March 21, 2006, the Appeals Council denied Plaintiff's request for review. (Tr. at 8-10.) Thus,

the decision of the ALJ stands as the final decision of the Commissioner. Plaintiff has exhausted all administrative remedies.

## STATEMENT OF FACTS

The facts (as they relate to Plaintiff's arguments) are as follows:

*Medical evidence*

1. Plaintiff has a history of treatment for various illnesses, including asthma, depression, type II diabetes, and costochondritis[1]. On October 03, 2002, Plaintiff presented to the emergency room of the Kalispell Regional Medical Center in Montana with a left knee sprain. (Tr. at 197.) On November 8, 10, and 30, 2002, Plaintiff also presented to Kalispell Regional Medical Center emergency room due to complications with an abscess on his right thigh. (Tr. at 198-212.) When Plaintiff's knee problems did not subside, Plaintiff required additional visits to Kalispell Regional Medical Center emergency room on December 13, 16, and 18, 2002, January 5, 2003, and March 17, 2003. (Tr. at 213-227 and 234-238.) Plaintiff's abscesses began flaring up, requiring subsequent emergency room visits on April 7, 9, and 11, 2003. (Tr. at 239-251.) On September 12, and 17, 2003, Plaintiff suffered severe chest pains, resulting in loss of consciousness and difficult breathing. (Tr. at 259-280 and 282.) These incidents required visits to the emergency room as well. Id. Testing revealed highly elevated blood sugar and cholesterol levels. (Tr. at 268). Plaintiff visited Hosanna Health Care, P.C. as a follow-up on October 8, and 13, 2003. (Tr. at 282-285). On October 8, 2003 he was diagnosed with diabetes. (Tr. at 283).

2. After moving to Missouri, Plaintiff began seeing Rustico Ramos, M.D. on January 16, 2004. (Tr. at 287.) Dr. Ramos prescribed Lopressor (100 m.g. daily for

---

[1] Costochondritis is the "inflammation of one or more costal [rib] cartilages, characterized by local tenderness and pain of the anterior chest wall that may radiate,…." Stedman's Medical Dictionary (27th ed. 2000), 417-418.

hypertension), Glucophage (1000 m.g. daily for diabetes), Glucovance (1500 m.g. daily for diabetes), Lopid (1200 m.g. daily for high cholesterol), Meclizine (25 m.g. daily for dizziness) and Diazepam (15 m.g. daily for anxiety and muscle relaxation). (Tr. at 289.) Plaintiff saw Dr. Ramos (or an associate) on January 14, 16, 23, and 27, February 23, May 19, June 6, September 8, 10, and 15, 2004 for impairments related to his heart, knees, diabetes, cholesterol, and breathing. (Tr. at 287-325.) On April 19, 2004, at the suggestion of Dr. Ramos, Plaintiff saw an eye specialist, John Fitz, M.D. (Tr. at 309.) On July 11, 2005, Plaintiff admitted to Dr. Ramos he was forced to limit his visits because of his lack of health insurance and limited finances. (Tr. at 327.) At his December 13, 2005 visit to Dr. Ramos, Plaintiff complained of greater knee pain, but again stated he was forced to self-limit his medication because of insufficient resources to pay for his medication. (Tr. at 372.)

3. After over a year and a half of working with the Plaintiff, Dr. Ramos completed a medical source statement on July 11, 2005. (Tr. at 327-331.) Dr. Ramos noted that Plaintiff suffered from internal knee derangement on his left knee. (Tr. at 328.) Dr. Ramos opined that Plaintiff was not limited in his ability to sit, as long as he was given hourly breaks, but could only stand for a total of 30 minutes and walk for a total of 15 minutes during an eight-hour day. Id. Dr. Ramos noted that Plaintiff required the use of a cane. (Tr. at 331.) Finally, Dr. Ramos concluded that Plaintiff would need more than three breaks—a break every hour because of knee pain—during an eight-hour day. (Tr. at 331.)

4. Plaintiff also visited the emergency room of the Parkland Health Center on January 14, 2005 complaining of chest pain. (Tr. 338-345.) He was discharged after testing revealed he suffered from costochondritis. Id.

5. At the request of Plaintiff's attorney, Plaintiff was given a psychological evaluation by F. Timothy Leonberger, Ph.D. on June 30, 2005. (Tr. at 345-354.) After an extensive examination and IQ testing, Dr. Leonberger diagnosed Plaintiff with major depressive disorder (single episode, full remission, by history) and low-average intellectual functioning. (Tr. at 351.) Dr. Leonberger administered to Plaintiff the Weschler Adult Intelligence Scale – Third Edition. (Tr. at 345-354.) Plaintiff obtained a verbal IQ score of 79, a performance IQ score of 87, and a full scale IQ of 81. (Tr. At 350.) Dr. Leonberger completed a Medical Source Statement and rated Plaintiff as markedly limited in seven basic work-related areas of functioning. (Tr. at 353.) Dr. Leonberger found that Plaintiff had suffered a "substantial loss" of four basic work-related abilities.[2] (Tr. at 354.) Dr. Leonberger assigned to Plaintiff a Global Assessment of Functioning ("GAF" or Axis V) score of 50. (Tr. at 351.) A GAF of 41–50 is defined as serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders (4th ed., Text Revision 2000) (DSM-IV-TR), 34.

*Hearing testimony before the ALJ*

6. Plaintiff testified briefly at a hearing before the ALJ on May 18, 2005. (Tr. at 53-66.) The ALJ continued the hearing so that Plaintiff could obtain an attorney. Id. The second hearing was held on September 15, 2006. (Tr. at 68.) Plaintiff testified that he was thirty-seven years old. Id. Plaintiff explained that he had an eighth grade education, with a history of attending special education classes. (Tr. at 71.) Plaintiff testified that he last worked in September 2003 as a home-health aide. (Tr. at 71-72.) Plaintiff testified that before working as

---

[2] Social Security Ruling 96-9p provides that any one of those substantial losses would be sufficient to prevent the performance of unskilled work.

a home-health aide, he had worked selling Christmas trees. (Tr. at 189.) Plaintiff testified that he had previously worked as a janitor, security guard, laborer, tire seller and floor guard. (Tr. at 72-76.) Plaintiff explained that on October 8, 2003, he fell in a driveway, injuring his knee. (Tr. at 76.) Plaintiff testified that his doctors wanted to perform orthopedic surgery, but his employer refused to pay for the surgery. (Tr. at 76-77.) He testified that he initially began seeing Dr. Ramos in January 2004 for his knee pain and diabetes. (Tr. at 77.) Plaintiff explained that Dr. Ramos also wanted to refer Plaintiff to an orthopedic surgeon, but did not do so because of Plaintiff's lack of income. (Tr. at 77-78.) Plaintiff testified that he applied for Medicaid but was denied in 2004. (Tr. at 78.) Plaintiff explained that he did not try to find other medical sources because he could not afford other treatment. (Tr. at 99.) After initially responding to the ALJ's question that the only malady Dr. Ramos treated him for was his knee pain, it was revealed that Plaintiff did not understand the meaning of the word "malady" and that Dr. Ramos also treated him for heart problems, diabetes, and back pain. (Tr. at 86, 90.) Plaintiff testified that he takes Naproxen and Acetaminophen for his pain. Id. Plaintiff explained that the Naproxen and Acetaminophen took "the edge" off of his pain for about 45 minutes to an hour. Id. Plaintiff testified that he typically woke up around 7:30 a.m. and then walked around the house to loosen up his knee. (Tr. at 79.) Plaintiff clarified that after walking around the house, his knee was in more pain, requiring him to rest his knee for 30 minutes to an hour. Id. Plaintiff explained that Dr. Ramos prescribed a cane to Plaintiff. (Tr. at 80.) Plaintiff testified that after resting his knee, he would typically continue to rest until he needed to do something. Id. Plaintiff testified that he was limited in his daily activities. (Tr. at 82-90.) He explained that he had difficulty getting dressed, had given up fishing because of his pain, and had problems grocery shopping, vacuuming, bending, walking up steps and reaching above his head. Id. Plaintiff testified that he

applied for jobs, but employers refused to hire him because of his heart attack in September of 2003. (Tr. at 87.)

7. Glenn White, Ph.D., a vocational expert, also testified. (Tr. at 92.) Dr. White testified that the Dictionary of Occupational Titles classified Plaintiff's work as a home-health aide as semi-skilled work occurring at the medium exertional level. (Tr. at 93.) Mr. White also testified that the Dictionary of Occupational Titles classified Plaintiff's other various past relevant work all as unskilled work occurring at the light or medium exertional levels. Id.

8. The ALJ asked Dr. White to consider a hypothetical individual of Plaintiff's age, education and work experience. Id. In offering this hypothetical the ALJ noted that it was based upon evidence "prepared by no one with any medical expertise whatsoever." Id. The ALJ finished the hypothetical question by including restrictions that the hypothetical person could lift no more than 20 pounds occasionally and 10 pounds frequently, and:

> could stand and/or walk six hours in a eight hour day, and could sit at least six hours in an eight hour day. And should avoid climbing ladders, ropes and scaffolds, but could occasionally climb perhaps some stairs and stoop, kneel, crouch and crawl and balancing {inaudabile}. It doesn't say this here, but the person should avoid working at unprotected dangerous heights or unprotected dangerous machinery. With those restrictions, would the hypothetical individual be able to perform any of Mr. Copeland's past work?

(Tr. at 94.) Dr. White testified that such a hypothetical individual would be able to perform light work, such as Plaintiff's past work as a security guard, floor guard and tire seller. Id. Dr. White testified that these jobs existed in substantial numbers in the national economy. (Tr. at 94-95.)

9. Dr. White was then asked to consider an individual with the above limitations, except this individual could stand or walk no more than two hours in an eight hour day and should, "avoid repetitive use of the left lower extremity, that the knee that has the problem. Left lower extremity {inaudible} repetitive pushing and/or pulling. He could do it occasionally or

maybe frequently, but not repetitively throughout an eight hour workday." (Tr. at 95.) Dr. White testified that these restrictions would rule out all Plaintiff's past work, but not work at the sedentary level. Id. Dr. White explained that cashier and assembler jobs could be performed with these restrictions. (Tr. at 95-96.)

        10. The ALJ then asked Dr. White to consider a hypothetical individual with the above restrictions except that the individual would be required to "change position for some period of time. At the sedentary job, I would assume that would be a stand up and {inaudible} for a little bit. Would the—either the cashier job or the assembler jobs allow for that?" (Tr. at 96.) Dr. White testified that the hypothetical person could not perform the assembler or packing job if the shifting positions took the hypothetical person away from the job for more than 15 minutes three times a day. Id. Dr. White explained that if the person could remain at their task standing, the assembly and packing jobs would not be ruled out. Id. Plaintiff's attorney then asked Dr. White to assume the above hypothetical, except that when standing the individual would require the use of cane. (Tr. at 97-98.). Dr. White testified that there were no jobs in the national economy that an individual with those restrictions could perform. (Tr. at 98.)

        11. The ALJ then asked Dr. White to consider a hypothetical individual with the restrictions provided on Dr. Leonberger's medical source statement—that the individual had marked limitations in his ability to behave in an emotionally stable manner, make simple work-related decisions, maintain regular attendance and be punctual, maintain attention and concentration for extended periods, perform at a consistent pace without an unreasonable number and length of rest periods, and sustain an ordinary routine without special supervision—with marked defined as a limitation that seriously interferes with the ability to function independently, appropriately and effectively, such that this limitation is incompatible with the ability to perform

the function eight hours a day, five days a week or equivalent. (Tr. at 96-97). Dr. White testified that such an individual would not be able to engage in competitive employment. (Tr. at 97.)

*ALJ decision*

12.     The ALJ issued an unfavorable decision on September 23, 2005. (Tr. at 16-23.) The ALJ found that Plaintiff had not performed substantial gainful activity since October 8, 2003. (Tr. at 17, 22.) The ALJ found that Plaintiff had medical evidence of a torn meniscus of the left knee, costocohondritis, diabetes, hypertension, hyperlipidemia and sleep apnea (Tr. at 22.) The ALJ made no finding as to whether these impairments were severe. (Tr. at 16-23.) The ALJ found Plaintiff's allegations that his impairments precluded all work not to be credible. (Tr. at 18, 21, 22.)   Without reference to any medical evidence in the record, the ALJ then concluded that Plaintiff retained the physical residual functional capacity to perform light work. (Tr. at 19-20, 22.) This physical residual functional capacity was the same capacity that the ALJ acknowledged in the hearing was "prepared by no one with any medical expertise whatsoever." (Tr. at 93.) The ALJ discredited the IQ testing done by Dr. Leonberger, asserting that it was at odds with "the claimant's demonstrated ability to work in the past with his level of intellectual functioning." (Tr. at 21.) The ALJ found that Plaintiff's limited IQ did not cause the marked limitations suggested by Dr. Leonberger. (Tr. at 20, 22.)

13.     On March 21, 2006, the Appeals Council denied review. (Tr. at 8-10.)

**ISSUES**

The issues are whether the final decision of the Commissioner is consistent with the Social Security Act, regulations, and applicable case law, and whether the findings of fact of the ALJ are supported by the record as a whole.

**ARGUMENT**

A.   Standard of review

Judicial review of the Commissioner's final decision may be had under 42 U.S.C. § 405(g). Judicial review consists of both a review of whether the ALJ's findings of fact are supported by substantial evidence on the record as a whole, and a review of whether the ALJ's decision is based on legal error. Keller v. Shalala, 26 F.3d 856, 858 (8th Cir. 1994).

The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence on the record as a whole, shall be conclusive. 42 U.S.C. § 405(g); Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997). Supported by substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971), quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Substantial evidence can be less than a preponderance. Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998). Substantial evidence must be relevant evidence. Black v. Apfel, 143 F.3d 383, 385 (8th Cir. 1998).

All evidence in the record must be considered, whether it supports or detracts from the ALJ's decision, and the evidence as a whole must allow a reasonable mind to find adequate support for the ALJ's decision. Terrell v. Apfel, 147 F.3d 847, 661 (8th Cir. 1998); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000). The Court's review should be more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)); Cox, 160 F.3d at 1207; Tang v. Apfel, 205 F.3d 1084, 1086 (8th Cir. 2000). The only

way a reviewing court can determine if the entire record was taken into consideration is for the court to evaluate in detail the evidence used in making the decision and how any contradictory evidence balances out. Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998), quoting Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

The Court also reviews the decision to see if there has been an error of law. Newton v. Chater, 92 F.3d 688, 692 (8th Cir. 1996), citing Keller, 26 F.3d at 858. The Commissioner must abide by the law of this Circuit. Hutchison v. Chater, 99 F.3d 286, 288 (8th Cir. 1996). To the extent that the ALJ's decision does not comport with the holdings of this Circuit, it is in error, and must be reversed on appeal. Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997).

B. <u>The ALJ's determination of Plaintiff's residual functional capacity is not supported by the medical or other evidence.</u>

Residual functional capacity, ("RFC") is a medical question that must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001), citing Laurer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d448, 451 (8th Cir. 2000). "Residual functional capacity is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations." Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001), citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); 20 C.F.R. §§ 404.1545(a), 416.945(a). While the ALJ is not restricted to medical evidence alone in evaluating the RFC, the ALJ is required to consider at least some evidence from a medical professional. Laurer, 245 F.3d at 704. Social Security Ruling 96-8p[3] further requires that an

---

[3] Once published, Social Security Rulings are "binding on all components of the Social Security Administration." Grebenick v. Chater, 121 F.3d 1193, 1200 (8th Cir. 1997), quoting 20 C.F.R. § 422.406(b)(1). In fact, an "agency's failure to follow its own binding regulations is a reversible abuse of discretion." Stoglin v. Apfel, 130

> RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).... RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.

In his RFC assessment, the ALJ found Plaintiff to retain the ability:

> [T]o perform the physical exertional and nonexertional requirements of work except for prolonged standing or walking, lifting or carrying objects weighing more than 10-25 pounds, climbing of ropes, ladders or scaffolds, or doing more than occasional climbing of ramps and stairs, stooping, kneeling, crouching or crawling.

(Tr. at 22.) No medical evidence in the record supports these conclusions. During the hearing, the ALJ and Plaintiff's attorney formulated various hypothetical questions for the vocational expert that described options as to residual functional capacity. (Tr. at 68-101.) The ALJ acknowledged that he was assuming a residual functional capacity "prepared by no one with any medical expertise whatseover"—the same residual functional capacity ultimately used by the ALJ in his unfavorable decision. (Tr. at 93, 22.) The ALJ indicated that "State Agency medical evaluators, on January 7, 2004, indicated that the claimant could do light work...." (Tr. at 18.) However, the Physical Residual Functional Capacity Assessment completed by the state agency on January 7, 2004, as noted by the ALJ during the hearing, was completed by Lisa Cole, "Sr. Counselor Cape Girardeau DDS." (Tr. at 185-92). Page 8 of the evaluation completed by Ms. Cole was omitted from the record produced by Defendant and a true and accurate copy of that page is attached hereto as Plaintiff's Exhibit A. Ms. Cole is not a medical professional of any kind (a DDS Senior Counselor is not a psychologist or therapist, but rather a staff person that facilitates claims). The ALJ did not cite, let alone provide a narrative discussion, as to the

---

F.Supp.2d1060, 1067 (S.D. Iowa 2000), citing Carter v. Sullivan, 909 F.2d 1201, 1202 (8th Cir. 1990) (citing 20 C.F.R. § 404.408); see also Strong v. Apfel, 122 F.Supp.2d 1025, 1030 (S.D. Iowa 2000).

evidence supporting his RFC, but rather he adopted one provided by a non-medical professional. (Tr. at 22.)

> [Reliance] upon the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion … does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole. … Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits.

Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). It is error for an ALJ to give more weight to non-medical evidence than to medical evidence. Jeffcoat v. Bowen, 840 F.2d 592, 596 (8th Cir. 1988).

Moreover, the ALJ's findings as to Plaintiff's physical residual functional capacity are internally inconsistent. The Social Security Regulations define light work in part as work that, "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing." 20 C.F.R. §§ 404.1567(b), 416.967(b). Social Security Ruling 83-10 further specifies that light work requires standing or walking for approximately six hours in an eight-hour day. The ALJ found that the claimant could "perform light work consistent with Exhibit B1F." (Tr. at 19.) Exhibit B1F and light work allows for a claimant to stand and/or walk for 6 hours in an 8-hour workday. (Tr. at 185-192.); 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83-10. This is inconsistent with the ALJ's RFC that the claimant cannot perform "prolonged standing or walking." (Tr. at 22.) The non-medical state agency RFC assessment (Exhibit B1F) indicates that the claimant should "never" use ladders, ropes or scaffolds, which is inconsistent with the ALJ's finding that the claimant should avoid "prolonged" use of such equipment. (Tr. at 185-192, 22.) Therefore, the ALJ's decision is internally inconsistent as to the essential question of RFC. An ALJ's decision is not supported

by substantial evidence if it fails to "clearly and directly" assess the claimant's residual functional capacity in light the claimant's limitations. Grissom v. Barnhart, 416 F.3d 834 (8th Cir. 2005).

The ALJ incorrectly recounted the testimony of the vocational expert regarding Dr. Ramos' opinions and ignored Dr. Ramos' opinion that the claimant would require hourly breaks. On page 4 of the decision, the ALJ stated that "[w]hen asked to assume the restrictions of Dr. Ramos, the jobs the vocational expert identified were actually sedentary in exertion such as sedentary assembler and sedentary cashiers." (Tr. at 19). The ALJ quickly contradicted himself on page 5 of the decision, stating: "[t]he restrictions suggested by Dr. Ramos in Exhibit B9F were not materially different from those in Exhibit B1F…." (Tr. at 20.) To the contrary, Exhibit B1F (the DDS non-medical assessment of RFC) limited the claimant to light work, yet Dr. Ramos in Exhibit B9F limited the claimant to less then the full range of sedentary work (30 minutes standing and 15 minutes walking). (Tr. at 185-192, 328-331); see 20 C.F.R. §§ 404.1567(a), 416.967(a); SSR 83-10 (sedentary work is that which allows for "generally no more than about 2 hours" of walking or standing in an eight-hour day). Moreover, the vocational expert did not testify that sedentary assembler and sedentary cashier jobs would be available assuming Dr. Ramos' opinions are correct. (Tr. at 95-98.) Dr. Ramos' opinion is supported by Plaintiff's testimony that his knee pain was helped only by walking around in a manner that would take him away from a job's task, rather than merely "standing up"—a different possibility noted by the vocational expert but that is not supported by any of the evidence or mentioned by the ALJ. (Tr. at 78-80, 95-98.) Instead, the vocational expert testified that those jobs would be precluded if the "hourly breaks" recommended by Dr. Ramos involved being taken away from the job's task—the only reasonable meaning of "break." (Tr. at 96-98.) A "break" is defined as

"a short spell of recreation or refreshment in a period of work." The New Shorter Oxford English Dictionary, Vol. 1 (4th ed., 1993), 277.

The ALJ's RFC assessment is not consistent with and not supported by the opinions of the claimant's treating physician Dr. Ramos (as to breaks), the non-medical DDS assessment (as to exertional capacity), the opinions of the consultative examiner Dr. Leonberger (as to mental limitations), or any of the other evidence. (Tr. at 22, 328-331, 185-192, 345-54.) The key word used by the ALJ to describe the claimant's limitations as to standing or walking—"prolonged"—is not defined, does not appear in the record, and does not satisfy the ALJ's obligation to find whether the claimant can perform a function frequently, occasionally, 2, or 6 hours of 8. The ALJ failed to provide a specific residual functional capacity that was a clear indication of "what a claimant can do despite [his] limitations" based on "all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations." See Donahoo, 241 F.3d at 1039; 20 C.F.R. §§ 404.1545(a), 416.967(a). Therefore, remand is warranted.

B. <u>The ALJ's reasons for discounting the claimant's IQ testing are not supported by the record and, thus, the ALJ's decision is not supported by substantial evidence.</u>

The only reasoning described by the ALJ for discounting the claimant's IQ testing done by Dr. Leonberger was "the claimant's demonstrated ability to work in the past with his level of intellectual functioning." (Tr. at 20.) While this might be reasonable if the claimant's only impairment were his IQ, the evidence supports a different conclusion—that he has always had a borderline or low-average IQ and that he is now suffering from new physical limitations. The ALJ found that the claimant has an eighth-grade limited education, which is consistent with the IQ scores measured by Dr. Leonberger. (Tr. at 22, 328-331). "[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual

functioning." Maresh v. Barnhart, 438 F.3d 897, 900 (8th Cir. 2006)(quoting Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001)); see also 65 Fed. Reg. 50,753 (2000) (explaining that the regulations "permit us to use judgment, based on current evidence, to infer when the impairment began").

> [B]orderline intellectual functioning, if supported by the record …, is a significant nonexertional impairment that must be considered by a vocational expert. ... While borderline intellectual functioning may not rise to the level of a disability by itself, a claimant is nevertheless entitled to have a vocational expert consider this condition along with her other impairments to determine how it impacts upon the claimant's residual functional capacity. ... [I]t is of no consequence whether the claimant's borderline intellectual functioning pre-dated her application; the vocational expert still must consider it along with the claimant's other impairments.

Grissom v. Barnhart, 416 F.3d 834 (8th Cir. 2005).

A valid IQ score of 84 represents borderline intellectual functioning, and indicates a significant nonexertional impairment that must be considered by a vocational expert. Muncy v. Apfel, 247 F.3d 728, 735 (8th Cir. 2001). In order to discredit an IQ score, the ALJ must point to the examiner's report itself or seek clarification from another examiner. Cole v. Callahan, 970 F.Supp 708, 711 (S.D. Iowa 1997) citing Delrosa v. Sullivan, 922 F.2d 480, 485 (8th Cir. 1991), see also Berryman v. Massanari, 170 F.Sup.2d 1180. 1185 (N.D. Ala. 2001).

Since the ALJ failed to provide valid reasons for discrediting the IQ testing, his decision is not supported by substantial evidence and remand is warranted.

## CONCLUSION

The Commissioner's final decision is not supported by substantial evidence on the record as a whole, and it is not consistent with the Social Security Act, Regulations, rulings and applicable case law. Plaintiff therefore respectfully prays this court to enter Judgment for Plaintiff and grant Plaintiff relief as described in the Complaint.

Respectfully submitted,

**STONE, LEYTON & GERSHMAN<br>A PROFESSIONAL CORPORATION**

By: /s/ David D. Camp
    David D. Camp    E.D.#82370
    Brigid A. McNamara    E.D.#523046
    7733 Forsyth Boulevard, Suite 500
    St. Louis, Missouri 63105
    (314) 721-7011 (telephone)
    (314) 721-8660 (facsimile)
    *Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 18th day of July 2006, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

    Catherine L. Hanaway, United States Attorney
    Jane Rund, Assistant United States Attorney
    111 South 10th Street, Suite 20.333
    St. Louis, MO 63102
    Attorneys for Defendant

    /s/ David D. Camp