# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

PETE B. COPELAND,            )
                                     )
        Plaintiff,            )
                                     )
    vs.                        )       **Case No. 4:06CV632MLM**
                                     )
JO ANNE B. BARNHART,     )
                                     )
        Defendant.         )

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Jo Anne B. Barnhart ("Defendant") denying the application of Pete Copeland ("Plaintiff") for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. § § 401 et seq., and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§1381. Plaintiff filed a brief in support of the Complaint. Doc. 14. Defendant filed a brief in support of the Answer. Doc. 15. Plaintiff also filed a Reply. Doc. 16. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 7.

## I.
## PROCEDURAL HISTORY

In November 2003,[1] Plaintiff filed applications for disability benefits and SSI. (Tr. 139 - 41, 356-58). Plaintiff's applications were denied and he requested a hearing which was held before

---

[1] On Plaintiff's applications the handwritten date next to Plaintiff's signature is November 14, 2003, while date typed on the applications is November 12, 2003. (Tr. 139 - 41, 356-58).

Administrative Law Judge ("ALJ") Robert G. O'Blennis on September 15, 2005.[2]  By decision dated

September 23, 2005, the ALJ determined that Plaintiff was not under a disability as defined in the

Social Security Act.  (Tr. 16 - 23).

On March 21, 2006, the Appeals Council denied Plaintiff's request for review of the ALJ's

decision.  (Tr. 8-10).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

### A.  Plaintiff's Testimony:

Plaintiff testified that, at the time of the hearing, he was thirty-seven years old and lived with

his mother, his disabled fiancé and her two daughters, aged fifteen and seventeen; that he has an

eighth-grade education; that he took special reading classes while in school; and that his most recent

employment, which ended in 2003, was as at a nursing home where he cared for his fiancé. (Tr. 71-

76).

 Plaintiff testified that he became disabled on October 8, 2003; that on this date, while residing

in Montana, he fell down in his driveway, injuring his knee; that an orthopedic surgeon recommended

surgery to repair it; that he never had the surgery recommended by this doctor; that he received no

physical therapy; and that he was given a knee brace by the orthopedist in Montana.  (Tr. 76-77).

Plaintiff also testified that he received medication and another brace from Dr. Ramos in Missouri in

January 2004; that Dr. Ramos wanted to refer him to an orthopedist in Missouri but did not because

of Plaintiff's lack of funds, lack of employment, and lack of medical insurance; that Dr. Ramos has

since instructed Plaintiff not to wear the knee brace; that Dr. Ramos recommended that Plaintiff use

---

[2]  A previous hearing was scheduled for May 18, 2005.  The ALJ, however, postponed
that hearing so that Plaintiff might obtain counsel.  (Tr. 51- 65).

a cane while walking; and that Dr. Ramos gave Plaintiff exercises to minimize his knee inflamation. (Tr. 77-80, 86).

Plaintiff testified that he takes naproxen and acetaminophen for his knee pain; that these medications do not help with the pain all the time; that they help sometimes; and that "[a]bout forty-five minutes after I take [this medication], it'll knock the edge off." (Tr. 78). Plaintiff also said that he "walks around" the house for approximately forty-five minutes in the mornings in order to "ease the pain" in his knee and that he is in "constant pain." (Tr. 79, 82). Plaintiff also testified that after walking around in the morning for forty-five minutes the pain in his knees increases and that he has to sit down and rest his knee. (Tr. 79-80).

Plaintiff testified that Dr. Ramos has treated him for back problems; that Dr. Ramos prescribed naprosen for this condition; and that in 1996 he had physical therapy for his back. (Tr. 86). Plaintiff further testified that in 1997 or 1998 his "blood pressure shot" up; that as a result he threatened to commit suicide; and that, therefore, he was admitted to a mental health facility. (Tr. 85). Plaintiff also testified that he has heart problems; that in 2002 or 2003 he experienced a mild heart attack; that he received emergency room treatment; and that the emergency room physician prescribed one aspirin once a day. (Tr. 87). Plaintiff stated that he was diagnosed with Type II diabetes; that his blood sugar levels fluctuate quite a bit; that he can keep his blood sugar levels within a normal range through diet; that on the morning of the hearing his blood sugar level was 121, which was up from a prior reading of 112 from two days earlier; that when his blood sugar levels are "out of control" they are usually in the 220 - 230 range; and that his blood sugar level has gone as high as 1,200. (Tr. 90-92).

Plaintiff testified that he cooks lunch for his mother, fiancé and himself; that he goes to the grocery store once a month; that he has trouble dressing himself; that he tries to do dishes and

vacuum "but [he] can only do so much before [his] back starts hurting"; that he spends most of the day sitting, watching the news, and playing cards by himself; that when he sits and plays cards he does so for "15, 20 minutes at a time"; and he drove the hour and forty-five minutes it took to get to the hearing. (Tr. 71, 80-84). Plaintiff further said that the heaviest thing he can lift is a twenty pound bag of potatoes; that he can sit for twenty to thirty minutes before having to change to a standing position; and that he can stand a maximum of forty-five minutes. (Tr. 84-85)

## B. Vocational Expert's Testimony

W. Glynn White, a vocational expert, testified that a hypothetical person of Plaintiff's age, education, and work experience who could lift ten pounds frequently and twenty pounds occasionally and who could "stand and/or walk six hours in a[n] eight hour work day; could sit at least six hours in an eight hour work day;" who should not "climb ladders, ropes, and scaffolds;" who could "occasionally climb perhaps some stairs and stoop, kneel, crouch, and crawl and balancing"; and who "should avoid working at unprotected dangerous heights or unprotected dangerous machinery" could perform some of Plaintiff's past work, including security guard work and floor guard and that such jobs are available in significant numbers in the metropolitan area. In addition to these past jobs, the vocational expert testified that the above described hypothetical person could perform assembler jobs and that such jobs were available in significant numbers in the metropolitan area. (Tr. 92-95).

The ALJ posed an additional hypothetical to the vocational expert which included the limitations of avoiding "repetitive use of the left lower extremity" throughout an eight-hour day and of standing and/or walking no more than two hours in an eight-hour day. The vocational expert testified that someone with the limitations described in this second hypothetical could perform sedentary type work, including some cashier jobs and that such jobs are available in significant numbers in the metropolitan area. (Tr. 95-96). The vocational expert also testified that if the

hypothetical person needed to "change position for some period of time" and the person could "remain at their task standing," that "the cashier job [and] assembler jobs would allow for that." (Tr. 96). He testified that if a person with these additional limitations needed to use a cane then that person would not be able to "manipulate whatever they're manipulating." (Tr. 98).

If the above described limitations were expanded to include limitations that "seriously interfere[d] with the ability to function independently, appropriately, and effectively," including the "inability to maintain reliability, socially acceptable behavior, to make simpl[e] work related decisions, maintain regular attendance, be punctual, maintain attention and concentration for extended periods, perform at a consistent pace, [and] sustain an ordinary routine," the vocational expert testified that such a person would not be able to "engage in competitive employment." (Tr. 96-97).

### III.
### MEDICAL RECORDS

On October 3, 2002, Mark Harding, M.D., saw Plaintiff in the Emergency Department at Kalispell Regional Medical Center in Montana for swelling around his left knee and ankle. Notes of this date state that Plaintiff stated that he "was previously evaluated at this emergency department for a left knee sprain"; that Dr. Harding performed an ultrasound and an x-ray which showed "negative left ankle"; that the impression was "dependent edema of left lower extremity" and a "[p]rior left knee sprain"; that Plaintiff was prescribed Lortab; and that he was to recheck with orthopedist in one to two days. (Tr. 193-97).

Kalispell Regional Medical Center emergency room records dated December 13, 2002, reflect that Plaintiff presented for pain and swelling in his left knee and that he reported falling on some ice. Dr. Harding's notes of this date state that Plaintiff was diagnosed with an "acute knee sprain" and that he was prescribed Toradol, Lortab, and an ACE bandage. (Tr. 217).

Records of Kalispell Regional Medical Center dated December 16, 2002, reflect that Scott Rundle, M.D., saw Plaintiff on this date; that Plaintiff complained of knee pain; and that Plaintiff was prescribed crutches, ibuprofen, and Lortab; and that he was to have an MRI. (Tr. 219).

Records of Kalispell Regional Medical Center dated January 5, 2003, reflect that Plaintiff presented complaining of numbness in his left leg below the knee and pain radiating upward to his left groin area; that Plaintiff did not report a new injury; and that Plaintiff was diagnosed with parsthesia in the left lower extremity and a meniscal tear at the left knee. Records state that it was "suspect[ed]" that Plaintiff had "psychosomatic etiology." (Tr. 223-27).

Hugh Cecil, M.D., of the Kalispell Regional Medical Center reported on March 10, 2003, that views were taken of Plaintiff's right forearm because he had forearm pain. Dr. Cecil reported that the views showed no acute fracture, dislocation, or other acute osseous abnormality; that there was "calcification volar margin anterior acromial coronoid process which [did] not appear acute"; and that no acute bony abnormality of the right forearm was identified. (Tr. 233).

Records of Kalispell Regional Medical Center dated March 17, 2003, reflect that Plaintiff presented complaining of leg pain from the mid-thigh down and with a tingling sensation below the knee; that swelling was noted; that Plaintiff denied new injury; and that he was prescribed Lortab and Advil. Records of this date also state that Plaintiff had an MRI which showed torn cartilage. (Tr. 234-37).

Records of Kalispell Regional Medical Center emergency room dated September 12, 2003, reflect that Plaintiff presented complaining of chest pain; that Plaintiff had an EKG which showed normal sinus rhythm, normal axis, and no evidence of ischemia; that a chest X-ray showed no acute abnormalities; that a musculoskeletal examination showed normal muscle strength and tone, no signs of acute arthritis, clubbing, or significant edema; that tests showed that Plaintiff's blood sugar was

poorly controlled with moderate elevation; that Plaintiff had Type II diabetes, hypertension, and non-specific chest pain; that Plaintiff was prescribed Meclizine and Lopressor, and that Plaintiff was discharged on that same date. Nursing notes of this emergency room visit state that Plaintiff's condition had improved and that, upon discharge, Plaintiff was ambulatory. (Tr. 259-61).

Records of Kalispell Regional Medical Center emergency room dated September 17, 2003, reflect that Plaintiff presented with complaints of sharp, deep chest pain, trouble breathing, and cough; that Plaintiff was a smoker and overweight; that he had a sedentary lifestyle; that Plaintiff did not appear to be acutely ill; that pulmonary examination showed that Plaintiff's lungs were clear with equal breath sounds and adequate air supply; that cardiovascular examination showed regular rate with no significant murmurs, rubs or gallop; that musculoskeletal examination showed normal extremities with adequate strength and full ROM, no lower extremity swelling or edema, and tenderness to palpitation over the left anterior chest wall; that Plaintiff was prescribed ibuprofen; that he was discharged this same date; and that upon discharge Plaintiff was ambulatory and left alone. It was noted on this date that Plaintiff's prognosis was good. The attending doctor, Leah June Smith, M.D., reported that chest x-rays showed no acute abnormalities and that an EKG showed normal sinus rhythm, normal axis, and no evidence of ischeia. (Tr. 274-78).

On October 8, 2003, Plaintiff was seen by Annie Bukacek, M.D. Dr. Bukacek reported on this date that tests showed that Plaintiff had a high "HbAic"; that this indicated that Plaintiff had diabetes; that Dr. Bukacek prescribed glucophage; and that she referred Plaintiff to a diabetic educator and dietitian. (Tr. 284).

On January 7, 2004, Lisa Cole, a Senior Counselor, completed a Physical Residual Functional Capacity ("RFC") Assessment of Plaintiff.[3] This RFC Assessment states that Plaintiff was diagnosed with obesity, hypertension, and Type II diabetes; that Plaintiff can occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, "stand and/or walk" six hours in an eight hour work day, sit six hours in an eight hour work day, and can perform push/pull motions with no restrictions; that Plaintiff can occasionally climb ramps or stairs, can never climb ramps, rope, or scaffolds, can frequently perform balancing activities, and can occasionally stoop, kneel, crouch, and crawl. The RFC Assessment further states that Plaintiff has no manipulative, visual, communicative, or environmental limitations; that Plaintiff's medical records do not support his having a cardiac condition or heart damage; that there is no radiographic evidence of Plaintiff's having a bad left knee; that Plaintiff has no treatment history for back problems or sleep apnea; and that Plaintiff is overweight and smokes. (Tr. 185-192).

Records of the Parkland Health Clinic reflect that Plaintiff was seen on January 12, 2004 for chest pain; that Plaintiff was diagnosed with chostochondritis which condition is "due to an inflammation of the cartilage joining the ribs to the breast bone"; that chostochondritis is not caused by heart or lung problems; that chostochondritis "often occurs during times of emotional stress"; that "[i]t can be painful, but it is not dangerous"; that chostochondritis "usually disappears within one to two weeks, but may reoccur"; that Plaintiff was instructed to deal with stress by exercise, muscle relaxation, meditation, or taking time for himself; that Plaintiff was told he could take ibuprofen or medicine prescribed by his doctor to reduce inflamation; and that he was released. (Tr. 334-345).

---

[3]     The page reflecting who performed the RFC Assessment and when it was completed is not included in the Transcript. It was attached as "Exhibit A" to the Plaintiff's "Brief in Support of the Complaint".

Medical records reflect that Plaintiff was seen on January 14, 2004, complaining of "sharp chest pain radiating to the left arm"; that Plaintiff had Type II diabetes, tobacco abuse, and chostochondritis; that he was to continue taking Glucophage; that smoking cessation was recommended; and that he was referred for diet counseling. (Tr. 290).

Records of Parkland Health Clinic reflect that Plaintiff was seen on January 23, 2004, at which time he complained of injury to his left hand. (Tr. 291-92).

On February 23, 2004, Plaintiff was seen by Dr. Rustico Ramos at Parkland Health Clinic. Dr. Ramos reported on this date that Plaintiff's Type II diabetes was "well controlled"; that he had "healing excoriated dermatitis on left hand"; and that he had "dyshidrotic eczema but does not itch" (Tr. 316).

On March 19, 2004, Dr. John Fitz of Precision Eye Care saw Plaintiff pursuant to a referral because Plaintiff had two episodes of "blacking out." (Tr. 309).

Dr. Ramos's records reflect Plaintiff was seen on September 8, 2004. A radiology report of this date states that four views of Plaintiff's left knee were normal; that bony mineralization, alignment, joint spaces and surrounding soft tissue were unremarkable; and that no joint effusion was evident. (Tr. 319, 323).

A September 15, 2004 radiology report prepared by Kenneth D. Smith, M.D., states that Plaintiff had a history of left knee pain after falling a year earlier and that the impression from an MRI of the left knee was "peripheral oblique full-thickness tear posterior horn and region medial meniscus left knee." This radiology report further states that no displaced fragments were evident. (Tr. 325).

On June 30, 2005, pursuant to a request by Plaintiff's attorney, Plaintiff was seen by F. Timothy Leonberger, Ph.D., a clinical neuropsychologist, for a psychological evaluation. Dr. Leonberger's report states that Plaintiff said that he had past neck pain, ongoing knee and back

problems, chest pain, diabetes, vision problems, a prior episode of major depression after his father's death, and a week long hospitalization due to a suicide threat during that same time period. Dr. Leonberger's report further states that Plaintiff said that upon being hospitalized for a suicide threat he was prescribed Wellbutrin; that no follow up treatment was recommended upon his release; and that he stopped taking the medication shortly after leaving the hospital because it was making him drowsy. Dr. Leonberger reported that Plaintiff's major depressive disorder was marked by a single episode and was in "full remission." Dr. Leonberger's report further states that Plaintiff said that he was diagnosed as having a mild heart attack at age thirty-five; that he continued to have chest pain on an overage of once every three months; that this pain is like that of a heart attack; that age thirty-five he lost vision in his left eye; that pursuant to an MRI and eye examination by Dr. Fitz it was determined that he had an occipital stroke; that his vision in the top part of the visual field of his left eye was currently affected by the stroke; that eight months earlier he was diagnosed with Raynaud's disorder; and that his fingertips turn black on some occasions and he has burning pain in both of his hands. (Tr. 346-51).

Dr. Leonberger's report also states that Plaintiff said that he smoked one and a half packs of cigarettes per day; that, due to back pain, he could only do light loads of laundry, could not do any vacuuming, and could only do dishes for short periods of time; that he went grocery shopping; that his mother drove him on these trips; that he loaded the grocery bags into the car; that Plaintiff's fiancee's daughters unloaded grocery bags at home; that Plaintiff was able to drive; and that he did not drive very often; that he might be able to handle his own financial affairs; that he liked to play cards and watch television; and that he went out to dinner once every four to eight weeks. (Tr. 349).

Dr. Leonberger reported that Plaintiff arrived on time, "was awake, alert and oriented to person, place, time, and situation"; that Plaintiff's "speech was normal in rate, rhythm, tone,

articulation[,] and fluency"; that Plaintiff's "[t]hinking was logical and sequential"; that Plaintiff's "mood appeared euthymic and his affect was pleasant and friendly"; that Plaintiff's "[a]ttention/concentration was adequate for the tasks that were assigned"; that on a WAIS-III IQ test Plaintiff scored an 81, "which place[d] him in the Low Average range of intellectual functioning"; and that "[o]n WAIS-III subtests which best measure verbal and language abilities . . ., [Plaintiff] performed between the borderline and the low average range." (Tr. 349-50). Dr. Leonberger reported that Plaintiff's verbal IQ score was "79 (borderline range, 8th percentile)"; that his performance IQ score was "87 (low average range, 19th percentile)"; that his full scale IQ score was "81 (low average range, 10th percentile)"); that Plaintiff's verbal comprehension index was "78 (borderline range, 7th percentile)"; that his perceptual organization index was "89 (low average range, 23rd percentile"; that his working memory index was "95 (average range, 37th percentile)"; that his processing speed index was "93 (average range, 32nd percentile)." (Tr. 350). Dr. Leonberger further reported that:

> Measures of visual-spatial abilities ranged between the low average and the average range. ...

> Measures of attention/concentration were somewhat variable. He only solved oral arithmetic problems at a borderline rate. However, he was able to repeat 6 digits forward and 6 digits backwards, and this is an average performance. He achieved a high average range on a measure of auditory concentration and mental manipulation of well-known variables.

> Measures of psychomotor speed and information processing ranged between the low average and the average range. These included the Digit Symbol and Symbol Search subtests respectively.

(Tr. 350-51).

Dr. Leonberger reported that Plaintiff's only current medication was Glucophage which Plaintiff took once every three months and that Plaintiff was not taking medication to control his

blood pressure due to financial problems. Dr. Leonberger's diagnosis was as follows: at Axis I, major

depressive disorder, single episode, full remission; at Axis II, low average intellectual functioning; at

Axis III, by Plaintiff's report, myocardial infarction, diabetes, Raynaud's disease, back pain, left knee

pain, and vision problems; at Axis IV, unemployment, financial problems, limited social support

system, and chronic medical problems; and at Axis V, a GAF of 50,[4] current and in the past year. (Tr.

348-51).

In regards to functional limitations, Dr. Leonberger reported:

1. <u>Activities of Daily Living</u>: Mr. Copeland said that he is limited in this area by his back pain and restrictions on lifting and bending. He is able to do light loads of laundry and carry light shopping bags. However, he is unable to vacuum and cannot cook for long periods of time. He rarely does any driving and a friend drove him to this evaluation. His wife handles the finances. From his description of his daily activities, it appears that he and his wife are both assisted by her daughters to a large exten[t]. <u>Moderate to marked</u> impairment is found in this area.

2. <u>Social Functioning</u>: Despite an episode of major depression which required hospitalization, Mr. Copeland reported that he has not been treated for depression since 1997. Although his social circle is very limited, his mood appeared to be euthymic during the clinical interview. <u>Mild</u> impairment is found in this area.

3. <u>Concentration, Persistence, and Pace</u>: Mr. Copeland's performance on attention/concentration measures and psychomotor speed subtests were quite variable, ranging between the borderline and the high average range. His persistence and pace is detrimentally affected by his multiple medical problems. <u>Marked</u> impairment is found in this area.

4. <u>Deterioration or Decompensation in Work or Work-Like Settings</u>: Mr. Copeland's job history consists primarily of positions that have required moderate to significant

---

[4]      Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. <u>See</u> <u>Diagnostic and Statistical Manual of Mental Disorders, DSM-IV</u>, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. <u>Id.</u> at 32.

physical demands such as physical labor, machinist, custodial work, and factory work. Given his intellectual limitations (low average functioning) and his physical problems, <u>marked</u> impairment is found in this area.

(Tr. 352) (emphasis in original).

On July 3, 2005, Dr. Leonberger completed a "Medical Source Statement" for Plaintiff. In regard to "Activities of Daily Living" Dr. Leonberger rated Plaintiff as having moderate limitations in his ability to cope with stress, function independently, and behave in an emotionally stable manner. He rated Plaintiff as having marked limitations in regards to maintaining reliability. In regard to aspects of "Social Functioning," Dr. Leonberger rated Plaintiff's limitations as moderate with the exception that Plaintiff was markedly limited in his ability to maintain socially acceptable behavior. In regards to Plaintiff's "Concentration, Persistence, or Pace", Dr. Leonberger reported that Plaintiff had moderate limitations in his ability to understand and remember simple instructions. and that Plaintiff had marked limitations in his ability to make simple work-related decisions, maintain regular attendance and be punctual, maintain attention and concentration for extended periods, perform at a consistent pace without an unreasonable number and length of rest periods, and sustain an ordinary routine without special supervision. (Tr. 353-54).

Dr. Leonberger further reported in the "Medical Source Statement" that Plaintiff had a "substantial loss" in regard to the ability to understand, remember, and carry out simple instructions," the "ability to respond appropriately to supervision," the "ability to respond appropriately to usual work situations," and the "ability to deal with changes in a routine work setting." He also reported that Plaintiff's limitations "lasted 12 continuous months, or can be expected to last 12 continuous months at the assessed severity." (Tr. 354).

A receipt from Walmart reflects that a cane was prescribed for Plaintiff on July 11, 2005. (Tr. 184).

Records of Parkland Health Center reflect that Plaintiff was seen on July 11, 2005. Records of this date reflect that Plaintiff weighed 279 pounds and was 6'2" tall; that Plaintiff had a "left knee internal derangement"; that Plaintiff had not sought further treatment do to lack of insurance; that Plaintiff had Type II diabetes which was uncontrolled; that Plaintiff did not "record blood sugars"; that smoking cessation was recommended; that Plaintiff ambulated with a cane; and that he was taking naproxen for his knee; and that his HTN was controlled with Lopresor. (Tr. 327).

Dr. Ramos completed a "Physical Medical Source Statement" on July 11, 2005 in which Dr. Ramos stated that Plaintiff's diagnoses included left knee internal derangement, a "peripheral . . . full-thickness tear," and a medial meniscus tear. Dr. Ramos reported that in an eight-hour work day, Plaintiff could sit on an "unlimited" basis with hourly breaks, stand for thirty minutes, and walk for fifteen minutes and that Plaintiff could frequently lift and carry up to ten pounds, occasionally lift twenty-five pounds, and never lift fifty pounds. Dr. Ramos also reported that Plaintiff had no limitations in regard to his hands, vision, communication/hearing, and balance; that Plaintiff can frequently reach above his head; and that he can occasionally stoop and tolerate exposure to dust, odors, and noise. Dr. Ramos stated that Plaintiff's left knee injury could be expected to produce pain; that the pain would last all day; that it would be constant; that Plaintiff used a cane; that Plaintiff would not need to lie down and rest at any time during an eight-hour work day; that Plaintiff would need to take hourly breaks because of his knee impairment; that he expected Plaintiff's knee impairment to last longer than twelve continuous months; and that "the earliest date from which the limitations assessed on this form have existed at the assessed severity" was September 2001. (Tr. 328-331).

## IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. § § 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § § 404.1520(f). Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate

burden of persuasion to prove disability, however, remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder.

Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;
>
> (3) The medical evidence given by the claimant's treating physicians;
>
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
>
> (5) The corroboration by third parties of the claimant's physical impairment;
>
> (6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
>
> (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result

in death or has lasted or can be expected to last for a continuous period of not less than 12 months …." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health and Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the Plaintiff's credibility. Id. The ALJ must also consider the Plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the Plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the Plaintiff's complaints. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841(8th Cir. 1992); Ricketts v. Sec'y of Health and Human Servs., 902 F.2d 661, 664 (8th Cir. 1990); Jeffery v. Sec'y of Health and Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he

considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health and Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-7 (8th Cir. 1982) (en banc). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Id. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the Plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the Plaintiff's qualifications and capabilities. Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a Plaintiff's limitations, but only those which he finds credible. Rautio, 862 F.2d at 180; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Use of the Medical-Vocational Guidelines is appropriate if the ALJ

discredits the Plaintiff's subjective complaints of pain for legally sufficient reasons. <u>Carlock v.</u> <u>Sullivan</u>, 902 F.2d 1341, 1343 (8th Cir. 1990); <u>Hutsell</u>, 892 F.2d at 750.

# V.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. <u>Onstead</u>, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. <u>Krogmeier</u>, 294 F.3d at 1022.

Plaintiff asserts that the ALJ's determination of Plaintiff's residual functional capacity ("RFC") is not supported by substantial evidence in that it is not supported by medical or other evidence. Plaintiff also contends that the ALJ's disregard of the Plaintiff's IQ testing is not supported by the record and therefore not supported by substantial evidence.

## A.      Plaintiff's RFC:

The ALJ found that Plaintiff has the RFC for light work and that he has the RFC "for a wide range of at least sedentary work." In particular, the ALJ found that:

> [Plaintiff] has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for prolonged or frequent standing or walking, lifting, or carrying objects weighing more than 10-25 pounds, climbing of ropes, ladders or scaffolds, or doing more than occasional climbing of rams and stairs, stooping, kneeling, crouching, or crawling. There are no credible, medically-established mental or other nonexertional limitations, and no credible, medically-established, long-term mental impairment.

(Tr. 22).

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage

in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. A "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Eichelberger, 390 F.3d at 591.

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. Moreover, "[i]t is incorrect to find that an individual has

limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." Id.

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." Id. at *3. As stated above, at step four the claimant has the burden of persuasion to demonstrate his or her RFC. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). "If a claimant establishes [his or] her inability to do past relevant work, then the burden of proof shifts to the Commissioner." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir.2005) (citing Eichelberger, 390 F.3d at 591). In contrast to the first four steps of the sequential evaluation where the claimant carries the burden of proof, the Commissioner has the burden of production at step 5. Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004). At step five "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner." Goff, 421 F.3d at 790. Also, at step five, where a claimant's RFC is expressed in terms of exertional categories, it must be determined whether the claimant can do the full range of work at a given exertional level. The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id.

The Eighth Circuit has recently held in Eichelberger, 390 F.3d at 591, as follows:

> A disability claimant has the burden to establish her RFC. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. Id. We have held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001). "[S]ome medical evidence" must support the determination of the claimant's RFC, Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

SSR 96-8p states that an ALJ should discuss and analyze the objective medical and other evidence, including the claimant's complaints of pain and other symptoms; that the ALJ should consider his or her observations, if appropriate; that the ALJ should resolve inconsistencies in the evidence; and that the ALJ should set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

Contrary to Plaintiff's assertion the ALJ did consider the medical evidence of record, including the series of lower extremity sprains suffered by Plaintiff between October 2002 and May 2003; the ALJ considered Plaintiff's visits to the emergency room in March 2003 for his right forearm, in May 2003 for a nail puncture, in November 2002 for a dental abscess, and in September 2003 for complaints of chest pain; the ALJ considered that all of the foregoing events happened prior to Plaintiff's alleged onset date, October 8, 2003; the ALJ considered medical records of October 2003; the ALJ considered the evaluation of January 2004 which indicated that Plaintiff can perform light work; the ALJ considered the records of Dr. Ramos; the ALJ considered the report of Plaintiff's opthalmological examination of March 2004; and the ALJ considered Dr. Leonberger's consultive examination report. In particular, in regard to Dr. Ramos's records, the ALJ considered that Dr. Ramos reported that Plaintiff had non-cardiac chest wall pain. The ALJ also considered test results including a negative x-ray and an MRI which showed a torn medial meniscus.

Further the court notes that while Plaintiff alleges disability due to heart attack, emergency room records of September 17, 2003 reflect that Plaintiff was not acutely ill, that his prognosis was good, that chest x-rays showed no acute abnormalities, and that an EKG showed normal sinus rhythm, normal axis, and no evidence of ischeia. Most significantly, Dr. Ramos reported in July 2005 that, among other things, Plaintiff can sit on an unlimited basis with hourly breaks, has no limitations in regard to his hands, vision, communication, and balance, and can frequently lift and carry ten

pounds and occasionally lift twenty-five pounds. This finding of Dr. Ramos is consistent with the ALJ's finding in regard to Plaintiff's RFC with the exception of Dr. Ramos's finding that Plaintiff will need to take hourly breaks.

To the extent that the ALJ may not have addressed each and every medical record, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. See Moore ex rel. Moore v. Barnhart, 413 F.3d718, 721 n.3 (8th Cir. 2005); Montgomery v. Chater, 69 F.3d 273,275 (8th Cir. 1995).

Upon considering Plaintiff's allegations of pain, the ALJ considered that no doctor opined that Plaintiff is physically disabled. A record which contains no physician opinion of disability detracts from claimant's subjective complaints. See Edwards v. Secretary of Health & Human Services, 809 F.2d 506, 508 (8th Cir. 1987); Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir. 1981).

The ALJ also considered that limitations which Dr. Ramos imposed were mostly based on Plaintiff's left knee impairment which is presumably remediable. Also, in February 2004 Dr. Ramos reported that Plaintiff's diabetes was well controlled and in July 2005 it was reported that his HTN was controlled with Lopresor. Plaintiff testified at the hearing that his diabetes could be controlled with diet. Conditions which can be controlled by treatment are not disabling. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d at 384; Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450.

The court notes that when Plaintiff was diagnosed with chostochondritis he was told to take Advil, a non-prescription medication. Plaintiff testified at the hearing that naproxen and acetaminophen sometimes help with his knee pain. Treatment by taking dosages of non prescription

medication does not indicate disabling pain.  Benskin, 830 F.2d at 884.  See also Cruse, 867 F.2d at 1187 (holding that minimal consumption of pain medication reveals lack of disabling pain); Rautio, 862 F.2d at 179 (holding that failure to seek aggressive treatment and limited use of prescription medications not suggestive of disabling pain).

Also, the ALJ considered that Plaintiff has not had surgery or inpatient hospitalizations, "at least in recent years," nor has he received physical therapy or attended a pain clinic. (Tr. 20).  Seeking limited medical treatment is inconsistent with claims of disabling pain.  Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989).

The ALJ further considered that, to the extent that Plaintiff's daily activities are restricted, they are restricted more by his choice and not by medical prescription.  In regard to Plaintiff's daily activities, the court notes that Plaintiff drove for one hour and forty-five minutes to get to the hearing and that Plaintiff told Dr. Leonberger that he can do light loads of laundry, grocery shop, load groceries into the car, and drive.  While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints.  Eichelberger, 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy, 953 F.2d at 386; Benskin, 830 F.2d at 883; Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis, 239 F.3d at 967 (citing Benskin, 830 F.2d at 883).  "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff, 421 F.3d at 792

(citing <u>Riggins v. Apfel</u>, 177 F.3d 689, 692 (8th Cir. 1999)).  <u>See also</u> <u>Haley v. Massanari</u>, 258 F.3d 742, 748 (8th Cir. 2001); <u>Nguyen v. Chater</u>, 75 F.3d 429, 439-31 (8th Cir. 1996) (holding that a claimant's daily activities including visiting neighbors, cooking, doing laundry, and attending church were incompatible with disabling pain and affirming denial of benefits at the second step of analysis).

The court notes that Plaintiff has not sought further treatment for his knee due to lack of insurance.  <u>Riggins v. Apfel</u>, 177 F.3d 689, 693 (8th Cir. 1999) (holding that, despite a plaintiff's argument that he was unable to afford prescription pain medication, an ALJ may discredit complaints of disabling pain where there is no evidence that the claimant sought treatment available to indigents); <u>Benskin</u>, 830 F.2d at 884 (holding that treatment by hot showers and taking dosages of Advil and aspirin do not indicate disabling pain); <u>Cruse</u>, 867 F.2d at 1187 (holding that minimal consumption of pain medication reveals a lack of disabling pain); <u>Rautio</u>, 862 F. 2d at 179(failure to seek aggressive treatment and limited use of prescription medications is not suggestive of disabling pain).

Indeed, the vocational expert testified that if a person required the use of a cane, he would not be able to manipulate things required by a sedentary job.  Upon concluding that Plaintiff could perform sedentary jobs, the ALJ considered that Plaintiff did not have with him or use a cane at the hearing. (Tr. 19 - 21).  Thus, the ALJ did not conclude that Plaintiff's RFC was limited because he required the use of a cane.  While an ALJ cannot accept or reject subjective complaints *solely* on the basis of personal observations, <u>Ward v. Heckler</u>, 786 F.2d 844, 847-48 (8th Cir. 1986), an ALJ's observations of a claimant's appearance and demeanor during the hearing is a consideration. <u>Villarreal v. Secretary of Health & Human Services</u>, 818 F.2d 461, 463 (6th Cir. 1987) (holding that given his opportunity to observe the claimant, the ALJ's conclusions regarding the plaintiff's credibility should

not lightly be discarded). Consistent with the Regulations and case law, the ALJ in the matter under consideration did not base his conclusions solely on his observations during the hearing. SSR 96-8p; Ward, 786 F.2d at 847-48; Villarreal, 818 F.2d at 463.

Consistent with Eichelberger, 390 F.3d at 591, Lauer, 245 F.3d at 704, and Nevland, 204 F.3d at 858, the ALJ relied upon specific medical evidence to support his conclusions regarding Plaintiff's ability to function in the workplace. After considering the medical evidence and the record as a whole, after discrediting Plaintiff's complaints of pain, and after determining that Plaintiff does not have an impairment which meets or equals the severity of a listed impairment, the ALJ determined Plaintiff's RFC as set forth above. The ALJ then considered the requirements of his past work and concluded that Plaintiff does not have the ability to perform past relevant work. The ALJ determined, however, with the assistance of the vocational expert, that an individual with Plaintiff's RFC is capable of performing light and sedentary work. [5] In particular, the ALJ considered that sedentary

---

[5]  20 C.F.R. § 404.1567(a) defines sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Indeed, SSR 85-15, 1985 WL 56857, at *5, states that "[w]here a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. ... If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." The sitting requirement for the full range of sedentary work "allows for normal breaks, including lunch, at two hour intervals." Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (citing SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996)). Additionally the range of sedentary jobs requires a claimant "to be able to walk or stand for approximately two hours out of an eight-hour day. SSR 96-9p requires that "the RFC assessment should include the frequency with which an applicant needs to alternate between sitting and standing, and if the need exists, that vocational expert testimony may be more appropriate than the grids." Id. The ALJ in the matter under consideration, however, did not find that Plaintiff requires more than normal breaks or that he must alternate sitting and standing. In any case, SSR 96-9p states that "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of disabled."

work requires lifting no more than ten pounds and walking and standing only occasionally and that Plaintiff can perform a wide range of sedentary work. Because the vocational expert testified that sedentary jobs which a person with Plaintiff's RFC were available in significantly numbers, the ALJ found that Plaintiff is not disabled.

Plaintiff contends that the ALJ's decision is internally inconsistent and that he did not correctly recount the testimony of the vocational expert. Plaintiff also cites other alleged deficiencies in decision writing on the part of the ALJ. To the extent that there are deficiencies in an ALJ's "opinion-writing technique," such deficiencies do not require a court to set aside an administrative finding when they have no bearing on the outcome. See Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996); Robinson, 956 F.2d at 841. Indeed, in the matter under consideration the quantity and quality of evidence was enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis, 239 F.3d at 966 (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Moreover, an ALJ is required to use the testimony of a vocational expert only where he finds that a claimant has credible nonexertional limitations. Robinson, 956 F.2d at 839. The ALJ did not find that Plaintiff had a nonexertional impairment. He, therefore, could have relied upon the Medical Vocational Guidelines and not utilized the testimony of a vocational expert. See Robinson, 956 F.2d at 839 (holding that if a claimant is found to have only exertional impairments, the Commissioner may meet this burden by referring to the Medical Vocational Guidelines). As such, the court finds that any deficiencies in decision writing did not affect the outcome of this case. Contrary to Plaintiff's assertion, the court finds that the ALJ's decision regarding Plaintiff's RFC is consistent with the case law and Regulations and that the decision in this regard is supported by substantial evidence on the record.

**B.     Plaintiff's IQ:**

Plaintiff contends that the ALJ improperly discredited Plaintiff's IQ scores as determined by Dr. Leonberger. Plaintiff further argues that because he allegedly has a nonexertional impairment, his low IQ, the ALJ should have incorporated this limitation into the hypothetical which he posed to the vocational expert. The ALJ did consider that Dr. Leonberger administered IQ tests to Plaintiff and considered the results of this testing. The ALJ concluded, however, that Dr. Leonberger's conclusion that Plaintiff's IQ causes marked restrictions is belied by Plaintiff's "demonstrated ability to work in the past with his level of intellectual functioning." (Tr. 20). Indeed, when a claimant has worked with an impairment, the impairment cannot be considered disabling without a showing that there has been a significant deterioration in that impairment during the relevant period. Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990).

The ALJ further considered that:

> The preponderance of the medical evidence in this case shows [Plaintiff's] abilities to think, understand, communicate, concentrate, get along with other people, and handle normal work stress to have never been significantly impaired on any documented long-term basis. There has been no serious deterioration in his personal hygiene or habits, daily activities or interests, effective intelligence, reality contact, thought process, memory, speech, mood and affect, attention span, insight, judgment or behavior patterns over any extended period of time.

(Tr. 20).

The ALJ further considered that Dr. Leonberger's own testing showed that, at worst, Plaintiff was no worse than low average intelligence.

Plaintiff does not allege that he is disabled based on mental retardation. Significantly, his verbal IQ of 79, his performance IQ of 87, and his full scale IQ of 81 are all above the level set forth in Listing C for finding a disability based on retardation. The Eighth Circuit holds that an IQ score within the 71-84 range "represents borderline intellectual functioning." Swope v. Barnhart, 436 F.3d

1023, 1024 (8th Cir. 2006). See also Muncy v. Apfel, 247 F.3d 728, 735 (8th Cir. 2001) (citing Thomas v. Sullivan, 876 F.2d 666, 668 n.1 (8th Cir. 1989)). Borderline intellectual functioning is a nonexertional limitation and, as such, where a claimant is found to have borderline intellectual functioning, that limitation must be included in a hypothetical to a vocational expert. Id. ("[B]orderline intellectual functioning, if supported by the record ... , is a significant nonexertional impairment that must be considered by a vocational expert.") (citations omitted). "[A]n ALJ [however] may disregard a claimant's IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior." Clark v. Apfel, 141 F.3d 1253, 1255-56 (8th Cir. 1998). See also Chunn v. Barnhart, 397 F.3d 667, 672 (8th Cir. 2005). When discrediting a claimant's IQ scores an ALJ should set forth the basis for his doing so. Swope, 436 F.3d at 1024 (holding that because the ALJ failed to indicate why he disbelieved the claimant's IQ scores, the ALJ should have included the claimant's borderline intellectual functioning in a hypothetical to a vocational expert).

In the matter under consideration Dr. Leonberger was retained by Plaintiff's counsel to perform a one time examination. Moreover, the ALJ set forth his reasons for not finding Dr. Leonberger's test results credible. In particular, the ALJ noted that Plaintiff's "daily activities, social interactions, and general interests" were inconsistent with an individual who has borderline intellectual functioning. (Tr. 21). The ALJ also considered that Plaintiff's work history as a forklift operator, security guard, and home health care worker indicates more than a borderline level of intellectual functioning. Indeed, "a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning. Muncy, 247 F.3d at 734 (citing Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir.1985) (holding that absent contrary evidence, an IQ test taken after the insured period correctly reflects claimant's IQ during the insured period); Guzman v.

Bowen, 801 F.2d 273, 275 (7th Cir.1986) (holding that the claimant had low IQ during onset of disability in 1979 rather than just when first IQ tested in 1982); Luckey v. Department of Health & Human Servs., 890 F.2d 666, 668-69 (4th Cir.1989) (holding that an ALJ could assume claimant's IQ remained relatively constant in absence of evidence showing a change in claimant's intelligence functioning); Holmes v. Apfel, 1999 WL 731769, *5 (N.D.Ill.1999) (holding that an IQ score presumptively reflects person's IQ throughout life, no matter how old the person was when test first administered); Ouellette v. Apfel, 2000 WL 1771122, *3 (D. Me.2000) (holding that absent contrary evidence, "a person's IQ and/or the condition of mental retardation is presumed to have been approximately constant throughout his/her life"); Sird v. Chater, 105 F.3d 401, 402 n. 4 (8th Cir.1997)). See also Maresh v. Barnhart, 438 F.3d 897 (8th Cir. 2006). Moreover, Plaintiff reported, in an "Activities of Daily Living Report" completed in December of 2003, that he could pay bills, use a check book, complete a money order, and count change. (Tr. 169).

The court finds, therefore, that the ALJ's failure to credit Dr. Leonberger's findings regarding Plaintiff's IQ and the ALJ's failure to incorporate Dr. Leonberger's findings in Plaintiff's RFC is based on substantial evidence on the record and is consistent with the Regulations and case law. See Swope, 436 F.3d at 1024; Clark, 141 F.3d at 1255-56; Muncy, 247 F.3d at 734. As such, the ALJ was not required to include Plaintiff's low IQ in a hypothetical to a vocational expert because an ALJ is only required to include those limitations which he finds credible in a hypothetical to a vocational expert. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999); Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988). Further, as stated above, where an ALJ does not find that a claimant has credible nonexertional limitations, an ALJ is not required to rely on the testimony of a vocational expert. See Robinson, 956 F.2d at 839.

## VI.
## CONCLUSION

The court finds that the ALJ's decision is supported by substantial evidence contained in the record as a whole, and that, therefore, the Commissioner's decision is affirmed.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in his Brief in Support of Complaint is **DENIED;** Doc. 14

**IT IS FURTHER ORDERED** that separate Judgment shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum Opinion.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this <u>6th</u> day of December, 2006.